## Picciuto v.
## Lucas County Commissioners
*[Cite as 7 AOA 194]*

*Case No. L-89-387*
*Lucas County, (6th)*
*Decided October 12, 1990*

*Stuart A. Ascher, for Appellants.*

*James R. Jeffery, James D. Jensen and Joan C. Szuberla, for Appellees.*

This matter is before the court on appeal from the Lucas County Common Pleas Court wherein appellees, the Lucas County Board of Commissioners, were granted summary judgment against appellants, Michael A. and Diane

Picciuto. Appellants have set forth the following assignments of error:

"1. THE TRIAL COURT ERRED IN CREATING AN ARTIFICIAL DISTINCTION BETWEEN THE LUCAS COUNTY BOARD OF COMMISSIONERS, LUCAS COUNTY, AND THE CHILD STUDY INSTITUTE OR ITS ADMINISTRATION AND IN GRANTING DEFENDANTS' MOTION FOR RECONSIDERATION THEREBY PRECLUDING THE INCLUSION OF ADDITIONAL PARTIES.

"2. THE TRIAL COURT ERRED IN DISMISSING PLAINTIFFS' NEGLIGENCE CLAIMS.

"3. THE TRIAL COURT ERRED IN DISMISSING PLAINTIFFS' CIVIL RIGHTS CLAIMS."

The facts giving rise to this appeal are as follows. In 1984, fifteen year old Anthony Picciuto was living with his parents and his three younger siblings in Toledo, Ohio. Anthony had a prior history of running away from home. In September 1984, Anthony's parents reported him missing. He was picked up by a Toledo police officer on September 14, 1984, at approximately 10:45 p.m. and delivered to the intake officer at the Child Study Institute ("CSI"), a county run detention center for juveniles. Upon his admission, Anthony was taken to the third floor of CSI where he turned over his personal clothing and possessions. He was then issued CSI clothing and bed clothing.

New arrivals to CSI were required to stay on their respective floors away from the rest of the detainees for a period of twenty-four hours. This was done to prevent the spread of possible disease and to allow time for the new arrival to be examined by a doctor. Anthony was assigned to the D section of the third floor. On September 15, 1984, dinner was brought to his room at 5:00 p.m. He then asked for and received a second helping. At 5:30 p.m., Anthony was locked in his room, pursuant to standard operating procedures, while the rest of the detainees on his floor went down to the dining room to eat dinner. Sometime between 5:30 and 5:50 p.m., Anthony committed suicide by tying his T-shirt to the wire mesh in his door and hanging himself.

On August 18, 1987, Anthony's parents, Michael A. Picciuto, individually and as administrator of the estate of Anthony Picciuto, and Diane Picciuto, filed a wrongful death action[1]

against the Lucas County Board of Commissioners; Ray Kest; James M. Holzemer; and, Alfred Hawkins, individually and as Lucas County Commissioners; and, Francis' Szollosi, individually and as administrator of CSI. The complaint alleged that the defendants had negligently, carelessly and recklessly failed to maintain adequate supervision of Anthony; failed to train their personnel to act in a prudent manner; abandoned Anthony in leaving no supervisory personnel to respond to his immediate needs; failed to make a careful search of Anthony, and to take from him anything which could have been used by him to injure himself, including his T-shirt, when they knew or should have known from their observations of Anthony that he was a suicide risk; and that the defendants had negligently, carelessly and recklessly failed to make cell checks of Anthony and to adequately provide for his safety. The complaint contained a demand for compensatory damages in the amount of $1,000,000, a demand in the amount of $4,000 for funeral and burial costs and a demand in the amount of $500,000 for the physical and mental pain of the decedent. The complaint also contained a claim under Section 1983, Title 42 of the civil rights act with a demand for compensatory damages in the amount of $2,000,000. Finally, the Picciutos sought $1,000,000 in punitive damages.

On October 27, 1987, appellees, James M. Holzemer and Alfred Hawkins filed an answer to the Picciutos' complaint in which they denied that they were negligent and/or responsible for Anthony's death. Holzemer and Hawkins alleged that:

(1) Anthony's death was the result of an intervening and superseding act which was unforeseeable;

(2) the Picciutos' claim was barred by or subject to the limitations set forth in Ohio's sovereign immunity statute, specifically R.C. 2744.04(B);

(3) the Picciutos' complaint failed to state a claim; and

(4) that on September 15, 1984, Paul Sullivan was the administrator of CSI.

On November 18, 1987, the Picciutos filed an amended complaint in which they added Paul Sullivan, administrator of CSI as a defendant and eliminated their request for judgments in specific monetary amounts.

On December 18, 1987, James Holzemer filed an answer to the Picciutos' amended complaint in which he denied being negligent.

Alternatively, he asserted that he was protected from liability by the doctrine of qualified immunity. Holzemer also asserted that the Picciutos' complaint was barred or subject to the limitations set forth in Ohio's sovereign immunity statute and that the Picciutos' federal claim was barred or subject to the federal doctrine of sovereign immunity.

Also on December 18, 1987, Hawkins filed a motion for summary judgment arguing that the undisputed facts showed that Hawkins was not a proper party to this suit since he did not begin serving on the board of county commissioners until 1985 which was after Anthony's death at CSI. The other appellees filed a motion for partial summary judgment arguing that the undisputed facts showed that Anthony's treatment at CSI satisfied constitutional standards. Appellees further argued that the Picciutos had an adequate remedy through their state claims.

On March 30, 1988, the court granted appellees' motion for partial summary judgment in part and denied it in part. The court found that there was no genuine issues of material fact as to whether or not Anthony was denied proper medical treatment or whether or not the CSI staff acted with deliberate indifference toward Anthony. The court also found that there was no genuine issue of material fact as to whether or not CSI's policy of restricting new arrivals to their respective floors for the first twenty-four hours was meant to punish or that it violated the detainee's constitutional rights. However, on the authority of *Youngberg v. Romero* (1982), 457 U.S. 307, and *Danese v. Asman* (E.D. Mich. 1987), 670 F. Supp. 709, the court found that the Picciutos had raised a genuine issue of material fact regarding the physical conditions of CSI. On January 19, 1989, Kest and Szollosi filed an answer to the Picciutos' amended complaint in which they denied they were negligent. Kest and Szollosi alleged that (1) Anthony's death was the result of an intervening and superseding act which was unforeseeable; (2) the Picciutos' claim was barred by or subject to the limitations set forth in Ohio's sovereign immunity statute; (3) the Picciutos' federal claim was barred by or subject to the federal doctrine of sovereign immunity; and, (4) that the defendants were protected from liability by the doctrine of qualified immunity.

On February 28, 1989, the court granted Hawkins' motion for summary judgment.

On March 3, 1989, the court, having found that defendant Paul Sullivan had not been served process, granted the Picciutos leave to file a second amended complaint for the purpose of bringing all of the proper parties before the court.

On March 7, 1989, the Picciutos filed a second amended complaint against the Lucas County Board of Commissioners; Ray Kest, individually and as a previous Lucas County Commissioner; James Holzemer, individually and as a Lucas County Commissioner; Frank Szollosi, in his administrative capacity only; Paul Sullivan, individually and as director of CSI; Larry Murphy, individually and as director of CSI; Frank Landry, individually and as business manager of CSI, Andy Devine as previous judge of the Lucas County Juvenile Court and the Lucas County Juvenile Court in its administrative capacity.

On March 17, 1989, appellees filed a motion to strike the second amended complaint and a motion to quash service of process on the newly named defendants. Appellees also filed a motion for reconsideration of the court's March 3, 1989 order allowing service of process upon Paul Sullivan. Appellees argued that Civ. R. 21 did not permit service on a party named in a complaint or an amended complaint when the party has not been served within the applicable time limit.

In a May 23, 1989 judgment entry, the court granted appellees' motion to strike, motion to quash and appellees' motion for reconsideration. The court found that the newly named defendants, including Paul Sullivan, had not been identified within the statute of limitations period nor were they put on notice that this case should have been brought against them.

On September 19, 1989, the remaining defendants, Ray Kest, James Holzemer, and Francis Szollosi filed a renewed motion for summary judgment arguing that the undisputed facts showed that they did not owe a duty to Anthony and therefore they were not negligent. The defendants further argued that they were entitled to summary judgment on the Picciutos' constitutional law claims in light of the Sixth Circuit Court of Appeals reversal of the *Danese* case. See *Danese v. Asman* (C.A.6, 1989), 875 F. 2d 1239.

On November 15, 1989, the court granted appellees' motion for summary judgment. The court found that (1) the Lucas County Commissioners had a limited statutory responsibility for CSI; (2) their main responsibility was to provide funding for CSI; (3) the commissioners properly

provided funding for CSI; and (4) the commissioners had no control over how the funds were spent. The court cited *Sawicki v. Ottawa Hills* (1988), 37 Ohio St. 3d 222, for the proposition that in some instances a special relationship exists to impose a duty upon public officials and their principal, such as a municipality. In *Sawicki*, the Ohio Supreme Court held that:

"In order to demonstrate a special duty or relationship, the following elements must be shown to exist: (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking." *Id.,* paragraph four of the syllabus.

Applying *Sawicki,* the court below held that had the Picciutos claimed a special relationship the claim would have failed since (1) there was no direct communication between the Picciutos and appellees; (2) there was no specific-knowledge of Anthony Picciuto's specific situation; and (3) there were no representations made to the Picciutos which could be relied on. Finally, on the basis of the Sixth Circuit's decision in *Danese, supra,* the court held that the Picciutos must show that incarcerated persons have a guaranteed right to suicide proof facilities. The Picciutos having failed to do this, the court found that there was no genuine issue of material fact regarding the physical conditions of Anthony's cell. Appellants now bring this instant appeal.

In their first assignment of error, appellants contend that there is no legal distinction between the Lucas County Commissioners and the county and/or its agencies. Appellants contend that by naming the commissioners as defendants, appellants impliedly named the county and its agencies as defendants. Thus, appellants contend that it was not necessary to separately name CSI and its administrators or to separately serve process on CSI and its administrators.

In general, counties can neither sue nor be sued. *Hunter v. Commrs. of Mercer County* (1860), 10 Ohio St. 515, 520; Ohio Jurisprudence 3d (1980) 273, Counties, Townships and Municipal Corporations, Section 312. The board of county commissioners as a quasi-corporate body, represents the county in legal actions against the county. *Hunter, supra; State ex. rel. Hartshorn, v. Walker* (1848), 17 Ohio 135, 141. The board's representative capacity, however, is essentially limited to the county's financial matters. *Jones v. Commrs. of Lucas County* (1897), 57 Ohio St. 189.

While appellants in this case have properly brought suit against the county by naming the commissioners as defendants, we find no authority for the proposition that the commissioners represent the county's agencies and agents in all tort actions. Rather, Civ. R. 4(A) provides that the clerk shall issue a summons "for service upon each defendant listed in the caption." Civ. R. 4.2(11) particularly addresses the method upon which a party shall serve a county agency or its administrators. The purpose of Civ. R. 4.2(11) is to assure that fair notice of a lawsuit is given to the appropriate governmental officer in charge of a governmental unit or the appropriate governmental lawyer who will be defending the suit. Civ. R 4.2(11), staff notes (1970). (See, also, Fed. R. Civ. P. 4(d) (6) which provides for service on a governmental organization "by delivering a copy of the summons and of the compliant·in the manner prescribed by the law of that state for the service of summons or other like process upon any such defendant.") It can therefore be inferred that the civil rules require plaintiffs to name county agencies and/or their administrators when plaintiffs wish to bring a cause of action against said parties. Accordingly, appellants' argument that the commissioners for purposes of process represent CSI and its administrators is without merit.[2]

Alternatively, appellants contend that the court erred in granting appellees' March 17, 1989 motion for reconsideration. Specifically, appellants contend that the court erred in reversing its March 3, 1989 order permitting appellants to add Paul Sullivan as a defendant.[3]

Parties may file motions for reconsideration of a trial court's ruling before final judgment is rendered. The court's decision on the motion is an interlocutory order and is therefore not appealable until final judgment has been rendered. However, the Ohio Rules of Civil Procedure do not allow parties to file motions for reconsideration in the trial court *after* the trial court has rendered a final judgment. *Pitts v. Dept. of Transportation* (1981), 67 Ohio St. 2d 378. This court will not reverse a trial courts granting of a motion for reconsideration unless the trial court has abused its discretion. Baldwins Ohio Civil Practice (1988), 66 Section

47.12. Abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St. 3d 217, 219. (Citations omitted.)

To reiterate, on March 3, 1989, the trial court granted appellants permission to add Paul Sullivan as a defendant pursuant to Civ. R. 21 and in the interest of bringing "all proper defendants before the court." On March 17, 1989, appellees filed a motion for reconsideration of the court's March 3 order. In a May 23, 1989 judgment entry, the trial court granted appellees' motion. In the journal entry, the judge thoroughly explained that upon reconsideration of the facts in this case, it was evident that the court had no power to allow appellees to add additional defendants since the statute of limitations had run on the cause of action and since Paul Sullivan had not been served process within one year of the action's commencement. The judge further explained that on March 3, 1989, she was under the impression that the issue of service on Paul Sullivan was being raised for the first time when in fact appellants had had many opportunities prior to March 1989 in which to serve process on Sullivan.

Civ. R. 21 provides in part:

"Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately."

The decision to allow the addition of new party defendants is within the sound discretion of the trial court. *Bill Gates Custom Towing, Inc. v. Branch Motor Express Co.* (1981), 1 Ohio App. 3d 149; see, also, *Michaels Bldg. Co. v. Ameritrust Co., N.A.* (C.A. 6, 1988), 848 F. 2d 674. However, the general rule is that a person may not be brought into a civil action as a new party defendant when the cause of action as to him is barred by the statute of limitations. *Likover v. Cleveland* (1978), 60 Ohio App. 2d 154, 157.

Civ. R. 3(A) provides:

"A civil action is commenced by filing a complaint with the court, if service is obtained within one year from such filing upon a named defendant, or upon an incorrectly named defendant whose name is later corrected pursuant to Rule 15(C), or upon a defendant identified by a fictitious name whose name is later corrected pursuant to Rule 15(D)."

The purpose behind Civ. R. 3's one year limitation is to hinder the growth of pending cases on crowded court dockets. *Maryhew v. Yova* (1984), 11 Ohio St. 3d 154, 157; *Saunders v. Choi* (1984), 12 Ohio St. 3d 247, 250.

As is clear from the text of Civ. R. 3, there are exceptions and/or ways to circumvent the one year limitation (see Civ. R. 15). Specifically, in some instances plaintiffs are permitted to file amended complaints and to perfect service outside the statute of limitations. These "amendments" are said to relate back to the filing of the original action thereby bringing the new party before the jurisdiction of the court. For example, a plaintiff who files his action within the limitations period and properly serves the defendant within one year but who later realizes that he has misspelled the defendant's name may amend his complaint to include the proper spelling of the defendant's name. This amendment will relate back to the time the action was originally commenced. Ohio Rev. Code Ann., Civ. R. 3, Editor's Note 4-5, (Page's 1989). If a plaintiff timely commences an action against a known defendant whose name is unknown, the plaintiff may timely serve the anonymous defendant and then upon learning his name, file an amended complaint to reflect the defendant's name even though the statute of limitations has run. This amendment will also relate back to the original filing. *Id.* at 5. A plaintiff may even file a timely action against an unknown "John Doe" defendant and then, even though the statute of limitations has run, serve the defendant within one year of commencing the action. *Id.* In *Hardesty v. Cabotage* (1982), 1 Ohio St. 3d 114, the Ohio Supreme Court found that the plaintiffs' amended complaint for malpractice related back to the original one; (1) plaintiffs had originally misnamed the defendant as the "Board of Trustees of Blanchard Hospital" rather than its correct name as found on the amended complaint which was "The Blanchard Valley Hospital Association, Inc."; (2) the address of the misnamed defendant was the exact same as that of the correct defendant; and, (3) when service for the misnamed defendant was signed for and received by the exact same person who signed and received the service on the correctly named defendant. In *Collins v. Dept. of Natural Resources* (Jan. 6, 1983), Franklin App. No. 82AP-370, unreported, the court cited McCormac, Ohio Civil Rules Practice, Section 9.06 (1970), for the proposition that:

"'The traditional rule for amendment of parties has been that an amendment may be made to correct a misnomer or mistake in the name of the party, but a new party must be brought into the action by service of summons and complaint with commencement of the action dating from the time that the amended complaint is filed as far as the new party is concerned. ***' [McCormac, Ohio Civil Rules Practice 199, Section 9.06 (1970).]"

The foregoing authorities demonstrate that Civ. R. 3(A)'s exceptions are not liberally available. Rather, the relevant case law and commentaries demonstrate that relation back will be allowed for the most part in situations where the plaintiffs have a particular defendant in mind but for whatever reason they are unable to properly identify said defendant within the applicable limitations period. Generally, in these situations, plaintiffs have given the court some notice of their dilemma before the end of the limitations period. These cases further a policy of hearing cases On their merits rather than dismissing them On minor technical grounds.

However, it is more than a mere technicality to allow the addition of a new party defendant beyond the statute of limitations period when it does not appear that said defendant was considered in the original complaint. The record in the present case shows that appellants were granted leave to file an amended complaint on November 12, 1987. The amendment was filed on November 18, 1987, adding Paul Sullivan as an administrator. This was three months after the filing of the original complaint or well within the statute of limitations period of R.C. 2125.02(D) and 2125.04 (the statute of limitations as extended pursuant to R.C. 2125.04 expired on August 18, 1988).[4] Yet, as of the pretrial of March 1, 1989, well beyond the statute of limitations period, appellants had not attempted service on Paul Sullivan. The record shows that the plaintiffs do not offer any explanation for their failure to serve Paul Sullivan between November 18, 1987 and August 18, 1988, although Sullivan was specifically named in the November 18 amended complaint. Consequently, the trial judge incorrectly assumed that during the limitations period Paul Sullivan was a known but unattainable defendant much like the defendants discussed above to whom Civ. Rs. 3 and 15's exceptions applied. Upon reviewing the facts pursuant to appellees' motion for reconsideration, the trial judge

discovered that Sullivan had been named as a defendant within the statute of limitations period and that there did not appear to be any justification for failing to obtain service on him within a year.

Appellants now contend that a decision was made not to timely perfect service on Paul Sullivan since he had recently suffered a heart attack. Appellants add that "it was never necessary in the first place to serve Sullivan because lie was, in reality, an employee and administrator of the county." Having already determined that it was necessary to serve Sullivan in order to bring him into the action, we note that the, issue of Sullivan's heart attack was never brought before the trial court. Had the issue been brought before the trial court it would not have excused appellants' failure to perfect service on Sullivan. The trial judge in this case was faced with a set of facts which warranted a finding that no action could be commenced against Paul Sullivan or any other defendants who were not properly named within the statute of limitations period. Based upon the foregoing, we find that the trial court did not abuse its discretion in reversing its prior order allowing appellants to serve process on Paul Sullivan. Accordingly, appellants' first assignment of error is found not well-taken.

In their second assignment of error, appellants contend that the court erred in granting appellees' motion for summary judgment thereby dismissing their negligence claim. Appellants had claimed that appellees "negligently, carelessly, and recklessly failed to Provide a reasonably safe cell." This court's role in reviewing the trial court's decision granting appellees' motion for summary judgment is the same as the trial court.

Counties are liable in negligence if a duty has been violated and a tort has been committed. *Zents v. Bd. of Commrs.* (1984), 9 Ohio St. 3d 204, 207. Counties are subject to liability under statute as well as under common law. *Heckert v. Patrick* (1984), 15 Ohio St. 3d 402, 406. R.C. 305.12 is the statute which imposes liability on county commissioners. It provides in part:

"§ 305.12 Liability of commissioners.

"The board of county commissioners may sue and be sued, and plead and be impleaded, in any court. It may bring, maintain, and defend suits involving an injury to ally public, state, or county road, bridge, ditch, drain, or watercourse in the county with respect to which

the county has the primary responsibility, to keep in proper repair, and for the prevention of injury to them."

R.C. 305.12 is restricted to the deterioration or disassembly of county roads and bridges. *Heckert, supra,* at 406. (It is the General Assembly's "intention not to impose liability on the commissioners in matters unrelated to actual roadway conditions"). *Id.* at 407; *Ruwe v. Bd. of Cty. Commrs. of Hamilton* (1986), 21 Ohio St. 3d 80, 82. Nothing in R.C. 305.12 imposes a duty on the commissioners to provide a safe jail cell.

Appellants argue that statutory liability can be imposed on the commissioners under the purview of R.C. 2151.34 which provides in pertinent part:

"Upon the advice and recommendation of the judge, the board of county commissioners shall provide, by purchase, lease, construction, or otherwise, a place to be known as a detention home, which shall be within a convenient distance of the juvenile court, and not used for the confinement of adult persons charged with criminal offenses, where delinquent, unruly, dependent, neglected, abused children, or juvenile traffic offenders may be detained until final disposition. \*\*\*

"The county or district detention home shall be maintained as provided in sections 2151.01 to 2151.54 of the Revised Code. \*\*\* the necessary expenses incurred in maintaining such detention home shall be paid by the county."

R.C. 2151.34 states that the juvenile judge shall annually submit to the county commissioners a written request for appropriations to be used for the maintenance and operation of the detention home. The juvenile judge determines the financial needs of the juvenile detention home. *In re Appropriation for 1979* (1980), 62 Ohio St. 2d 99. The amount requested by the judge is within the judge's discretion. *State, ex rel. Avellone, v. Bd. of Commrs. of Lake County* (1989), 45 Ohio St. 3d 58, 61.

A thorough review of R.C. 2151.01 through 2151.54 reveals that the county commissioners have a very limited role in the operation of CSI. That is, the commissioners are to provide CSI's necessary funding as determined by the juvenile judge. Depositional testimony in this case of CSI employees shows that CSI employees were under the direct authority of the juvenile court and that the commissioners did not have control over how the money they appropriated for CSI

was spent. In previous cases, the Ohio Supreme Court has been reluctant to find county commissioners liable for tort absent the presence of a clear and narrow duty in the Revised Code. See *Heckert, supra; Ruwe, supra; Ditmyer v. Bd. of Cty. Commrs.* (1980), 64 Ohio St. 2d 146; *Weiher v. Phillips* (1921), 103 Ohio St. 249. Following the Supreme Court's strict interpretation of the Revised Code as it pertains to the tort liability of county commissioners, we find that the commissioners, appellees herein, are under 110 statutory duty to provide safe cells in CSI.

As to the commissioners' tort liability under the common law, parties seeking redress in tort against a governmental entity are required to establish the requisite elements of the alleged tort. *Ruwe, supra,* at 82. The critical element in the case before us is whether the county had a duty or assumed a duty to provide reasonably safe detention cells in CSI. *Id.*; *Gelbman v. Second National Bank of Warren* (1984), 9 Ohio St. 3d 77. Under Ohio tort law, duty refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff.

In this case, there was no "relationship," assumed or otherwise, between Anthony, his parents and the Lucas County Commissioners. The commissioners had no contact with the CSI detainees. Nor did they take part in the, day to day operations of CSI. Furthermore, we agree with the trial court that the, facts in this case do not support a finding of a "special duty or relationship" between the parties as outlined in *Sawicki, supra.*

The rendering of summary judgment involves a tripartite determination that:

"(1) \*\*\* there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made \*\*\* ." *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St. 2d 64, 66; Civ. R. 56(C).

Construing the record and the applicable law in this case most favorably for appellants, we find no basis for imposing a duty on the county commissioners individually or in their official capacity. Accordingly, summary judgment on this issue was appropriate and appellants' second assignment of error is found not well-taken.

In their third and final assignment of error, appellants contend that the court erred in granting appellees' motion for summary judgment thereby dismissing appellants' civil rights claim. Appellants contend that appellees violated Anthony's substantive due process rights by failing to recognize that Anthony was suicidal and by failing to take the necessary steps to prevent Anthony's suicide. Appellants further contend that CSI's physical facilities were constitutionally deficient in that the cell doors were capable of being used by suicidal detainees to injure or kill themselves and because the building's audio system was broken down thus preventing effective communication between CSI staff and the detainees.

As noted above, the Sixth Circuit Court of Appeals has recently held that pretrial detainees have no clear established right to a "suicide-proof facility." *Danese, supra.* Moreover, the United States Supreme Court noting that detainees do not possess the "full range of freedoms of an unincarcerated individual" has held that corrections officials are entitled to wide discretion in executing policies needed to preserve institutional security and internal order. *Bell v. Wolfish* (1979), 441 U.S. 520, 546-547.

Appellants contend that CSI's twenty-four hour "not off the floor" policy violated Anthony's civil rights since it was penal in nature and because the policy prevented CSI staff from detecting Anthony's suicidal tendencies. The record in this case shows that the policy had two main purposes. First, it prevented the spreading of illness to other detainees from a new detainee pending a medical exam on the new detainee. Second, it prevented unnecessary disruption in the facility since new detainees often are "hot tempered" upon their initial admittance to CSI. Expert testimony in this case shows that similar policies are in effect in juvenile detention facilities throughout the country. The depositional testimony of CSI employees and Anthony's parents further shows that in September 1984, Anthony exhibited no signs that he was contemplating suicide. CSI employees were familiar with Anthony from his previous stays at CSI and they considered him to basically be a well-mannered young man. The only thing unusual about Anthony's stay at CSI in September 1984 was that he was sleeping a lot. However, this was not considered too alarming since fifteen year old Anthony had been living on the streets for a few days prior to being delivered to CSI.

As to CSI's physical facilities, the record shows that the facilities, including the cell doors, were at all relevant times in accordance with state standards. There is no doubt that areas of CSI were in need of renovation but this is true of many correction centers funded by limited tax dollars. Appellants offered expert testimony which provided descriptions of more modern methods to house juvenile offenders. However, CSI's lack of more modern and efficient facilities does not necessarily mean that CSI's facilities deprived detainees of their constitutional rights.

Construing the evidence in this case and the applicable law most favorably to appellants, we find that there is no genuine issue of material fact regarding the constitutionality of CSI's policies and facilities. Accordingly, summary judgment on this issue was appropriate and appellants' third assignment of error is found not well-taken.

On consideration whereof, the court finds that substantial justice was done the party complaining, and the judgment of the Lucas County Court of Common Pleas is affirmed. Costs to appellants.

GLASSER, J., and RESNICK, J., concur.

ABOOD, J., concurs in judgment only.

---

[1] Case No. 85-0857 was filed on April 13, 1985, in the Lucas County Common Pleas Court. The case was dismissed without prejudice in the summer of, 1987.

[2] We note that in the deposition of Daniel Holzemer, a CSI employee at the time of the Picciuto incident, Holzemer stated that he was not being represented by the attorneys for the Lucas County Commissioners.

[3] On June 8, 1989, appellants filed a notice of appeal of the court's May 23, 1989 interlocutory order granting appellees' motion for reconsideration. This court dismissed the appeal as not being a final, appealable order on August 23, 1989.

[4] "2125.02 Proceedings; damages allowable; time limitation

"***

"(D) All actions for wrongful death shall be commenced within two years after a decedent's death."

"2125.04 New action

"In every action for wrongful death commenced or attempted to be commenced within the time specified by section 2125.02 of the Revised Code, if a judgment for the plaintiff is reversed or if the plaintiff fails otherwise than upon the merits, and the time limited by such section for

the commencement of such action has expired at the date of such reversal or failure, the plaintiff or, if he dies and the cause of action survives, his representative may commence a new action within one year after such date."