ESTATE OF Raymond James CART-WRIGHT, and Barbara Reid individually, surviving natural mother of Raymond James Cartwright, and as administrator of the estate of Raymond James Cartwright, Plaintiffs,

v.

CITY OF CONCORD, CALIFORNIA, and Thomas L. Bender, Frank H. Dowell, Catherine E. Duerks, James M. Jennings, Ronald P. Minges, and Lloyd C. Stottsberry, present or former employees of the Concord Police Department, Defendants.

No. C–81–3010–CAL.

United States District Court, N.D. California.

Aug. 19, 1985.

Lloyd F. Scott, Walnut Creek, Cal., John Houston Scott, San Francisco, Cal., Julie M. Houk, Berkeley, Cal., for plaintiffs.

James L. Hazard, Sellar, Engleking & Hazard, Walnut Creek, Cal., for defendants.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEGGE, District Judge.

This is an action under 42 U.S.C. § 1983, brought on behalf of the decedent Raymond James Cartwright ("Cartwright") and by his mother Barbara Reid ("Reid") individually and as administrator of Cartwright's estate. The complaint alleges violations of the United States Constitution in regard to the death of Cartwright in a jail of the defendant City of Concord.

A jury trial was waived by both sides, and the case was tried to the court from July 1, 1985 through July 23, 1985, when plaintiffs rested their case. Defendants then moved for a directed verdict under Rule 50(a) and for judgment under Rule 41(b) of the Federal Rules of Civil Procedure. Under the applicable procedure, the court has treated both motions as a motion for involuntary dismissal under Rule 41(b). The court granted the motion of defendant Thomas L. Bender in open court, and the motion of the other defendants was taken under submission.

Under Rule 41(b), the court has the power to weigh the evidence, resolve conflicts in the evidence, decide where the preponderance of the evidence lies, and rule against plaintiffs if plaintiffs' evidence and law are not sufficient to satisfy their burden of proof. The court has reviewed and

compared the testimony of the witnesses, has reviewed the exhibits, and has read the voluminous briefs and authorities submitted.[1] The court makes the following findings of fact, by a preponderance of the evidence, and conclusions of law. The court concludes that judgment should be entered in favor of defendants and against plaintiffs.

## I.

It was stipulated by the parties that Cartwright hanged himself in a Concord city jail cell on the night of July 19, 1979. He was pronounced dead on arrival at the hospital.

The fact that the cause of Cartwright's death was suicide is an important stipulation, for two reasons. One is that earlier pleadings and earlier discovery had in essence accused defendants of homicide. Second, plaintiffs' presentation of evidence contained extensive innuendo and implications of intentional misconduct by defendants. Those innuendos and implications were more significant here than mere style in the method of presentation of evidence. Rather, much of plaintiffs' alleged conflict in the evidence, and plaintiffs' third claim (discussed below), are grounded on those innuendos and implications. It was also stipulated between the parties that the alleged misconduct of defendants were errors of omission, and not ones of commission.

Plaintiffs make three claims rising from Cartwright's suicide:

1. Defendants should have prevented the suicide.

2. Defendants did not give adequate medical aid to Cartwright after discovering him hanging in his cell.

3. Defendants later conducted an inadequate investigation of the events, and lost or destroyed evidence.

Plaintiffs' counsel are to be complimented for their thorough investigation and presentation of the case. The investigation was exhaustive. Every available witness was produced, and plaintiffs searched for other potential witnesses. Every piece of possible evidence on behalf of plaintiffs was brought to bear, and counsels' examination of the witnesses (most of whom were adverse) and the evidence was detailed and well prepared. But by a preponderance of the evidence the facts and the law do not establish any liability of the defendants.

Some of the evidence was conflicting, which required resolution by this court. However, some of the conflicts were on irrelevant matters, and some were conflicting only on the assumption of plaintiffs' innuendo and implications of intentional misconduct. Some of the "impeachment" of the witnesses was on matters which were not really impeaching, or was merely an exaggerated use of certain key words; for example, plaintiffs called ordinary personal acts a "policy" or "practice" just to attempt to bring them within applicable legal standards. Some of the supposed conflicts resulted naturally from the fact that these events occurred six years ago. Those events, and the memories of the witnesses regarding them, were explored in repetitive and minute detail. And some alleged conflicts involved documents written six years ago for different purposes, which did not cover the details or alleged facts that plaintiffs now believe important for this suit. In summary, while there were conflicts in the evidence which the court has had to resolve, most of the alleged conflicts were more superficial and argumentative than real.

## II.

Cartwright and his companion Krystal Daniello were together on the afternoon of July 19, 1979. Both had been drinking

---

1. Plaintiffs requested that the court await their receipt of certain portions of the trial transcript before ruling on this motion. However, the court does not believe that further continuance or expense is necessary. The court maintained detailed notes on the testimony of the witnesses and has reviewed each of the exhibits.

extensively and had taken drugs which were at least Valium. Cartwright was carrying a large knife. Late that day, a citizen called the police because Cartwright was handling the knife in public.

The Concord Police Department responded to the call. The police officers arrested Cartwright for public intoxication under California Penal Code § 647(f). The police took the knife away from him but did not charge him with any crime with respect to the knife. Daniello was arrested at the same time on outstanding warrants. Cartwright and Daniello were taken to the Concord city jail.

The jail is a temporary holding facility. Persons charged with serious crimes were usually transferred at some later time from that facility to another jail within the county. Prisoners who showed signs of medical or psychiatric problems were customarily transferred to the county hospital. Female prisoners were generally not kept in the jail overnight, but the jail did have a cell just for female prisoners. Under the procedures that existed at the time, intoxicated prisoners were held for a few hours in the jail until they were sober, and were then released with no further charges filed against them.

When arrested and brought to the jail, Cartwright was visibly under the influence of alcohol or drugs. He was booked, and his personal effects were taken from him except for his shirt, pants, socks, and underwear. He was placed in a cell with another prisoner; however, that prisoner was released later that evening, so Cartwright was thereafter alone in his cell. At the time of his death, there were no prisoners in the jail except Cartwright and Daniello.

Because Daniello was assaultive and abusive, she was not immediately booked. She was searched, given jail clothing, and placed in the separate women's cell.

At 9:52 or 9:53 p.m., one of the jailers, defendant Stottsberry, found Cartwright hanging in his jail cell. Cartwright had torn, or had sawed by use of the edge of the bed in his cell, a strip from his jail cell blanket. He had fashioned a noose with the strip of blanket and had tied it around one of the high bars of his cell. He was not totally suspended by the noose, but rather his feet were touching the ground and he was slumped in the noose.

When Stottsberry discovered Cartwright he immediately called for help. He also attempted to lift Cartwright's weight, so that Cartwright was not suspended by the noose. Other officers and jail personnel responded to the call for help, including jailer defendant Dowell and police officer defendants Duerks and Jennings. Dowell cut Cartwright down by cutting through the blanket with a pocket knife he carried. The police officers immediately called for outside emergency help by the ambulance and fire departments. After Cartwright was cut down, defendants attempted to determine if he was dead or alive and to give him aid.

Approximately five to seven minutes after Cartwright was first discovered hanging, the ambulance arrived. The fire department's resuscitation unit arrived a few minutes later. The ambulance and fire personnel took over the giving of aid to Cartwright, and then took him to the hospital. The doctor at the hospital also attempted to revive Cartwright, but was unable to do so and pronounced him dead on arrival. From the time he was discovered, Cartwright displayed no signs of life or any clinical response to any of the emergency aid or medical treatment given to him.

After Cartwright was taken from the jail and upon learning that he had been pronounced dead, the Concord Police Department conducted an internal investigation of the death. An independent investigation was also conducted by the Contra Costa County Sheriff-Coroner and a coroner's inquest was held. The investigations and inquest concluded that Cartwright's death was a suicide by hanging, and no charges or accusations were brought against anyone.

Other more detailed facts will be discussed below as they pertain to plaintiffs' specific claims.

## III.

Plaintiffs filed this action two years later, under 42 U.S.C. § 1983.[2] Section 1983 requires plaintiffs to establish a violation by defendants of plaintiffs' constitutional rights. Plaintiffs' Third Amended Complaint alleged the fourth, fifth, ninth, and fourteenth amendments to the United States Constitution. Most of the briefing and arguments have focused on the eighth amendment, although that is not one of the causes of action alleged in the Third Amended Complaint. The individual defendants were sued in their individual capacities, and the defendant City of Concord because the individuals were allegedly acting pursuant to customs or policies of the city.[3]

As stated, plaintiffs' allegations are three: 1. Defendants should have prevented Cartwright's suicide. 2. Defendants did not give adequate aid to Cartwright after discovering him hanging in his cell. 3. Defendants later conducted an inadequate investigation and lost or destroyed evidence. The evidence and legal standards applicable to each of these claims will be discussed in order.

## IV.

### Preventing Cartwright's Suicide

■ Plaintiffs allege that their constitutional rights were violated because defendants did not prevent Cartwright's suicide.

For purposes of this case, the court will assume that the constitutional rights of convicted prisoners also extend to pretrial detainees. *See Revere v. Massachusetts General Hospital,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983). And there are cases from other circuits holding that individual and municipal defendants can, under certain circumstances, be liable for failing to prevent the suicide of a prisoner. *E.g., Guglielmoni v. Alexander,* 583 F.Supp. 821 (D.Conn.1984); *Matje v. Leis,* 571 F.Supp. 918 (S.D.Ohio 1983); *Madden v. City of Meriden,* 602 F.Supp. 1160 (D.Conn.1985); *Partridge v. Two Unknown Police Officers,* 751 F.2d 1448 (5th Cir.1985).[4]

There is a difference of opinion between plaintiffs and defendants, and possibly a difference between reported decisions in this circuit, as to the legal standard which should apply to such alleged liability. Plaintiffs contend that the standard is one of mere negligence, citing *Hirst v. Gertzen,* 676 F.2d 1252 (9th Cir.1982), interpreting *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Defendants contend that in order to be liable for preventing a prison suicide, plaintiffs must show that defendants had actual knowledge of a serious medical need or likelihood of harm, and were deliberately indifferent to it; citing *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); and *Albers v. Whitley,* 743 F.2d 1372 (9th Cir. 1984). The Ninth Circuit addressed this conflict in *Haygood v. Younger,* 718 F.2d 1472, 1482–83 (9th Cir.1983), but the application of that decision to these facts still leaves a question as to which standard should apply in this case.

However, this court need not resolve that question here. The reason is that the court finds by a preponderance of the evidence that defendants were not negligent, let alone deliberately indifferent to a known serious medical need or likelihood of harm.

---

**2.** The court ruled at the beginning of trial that even if the period of limitations for Section 1983 actions in California was altered by the Supreme Court in *Wilson v. Garcia,* —— U.S. ——, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) and *Springfield Township School District v. Knoll,* —— U.S. ——, 105 S.Ct. 2065, 85 L.Ed.2d 275 (1985), those decisions would not be applied retroactively to this case under the principles of *Chevron Oil Company v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).

**3.** The policy alleged in paragraph 29(a) of the Third Amended Complaint was abandoned by plaintiffs before trial.

**4.** These cases are distinguishable on their facts from the present case. They were also opinions pertaining to pretrial motions and were not decisions after trial.

When Cartwright was brought to the jail, he was visibly under the influence of alcohol or drugs. When he was booked, defendants took from him his belt, shoes, knife, and everything except his soft clothing. He was placed in a cell with another prisoner, which provided some measure of protection from self harm. The other prisoner was released later in the evening; and there was no other prisoner in the jail except Daniello, who for reasons of gender could not be housed in the same cell as Cartwright. The only thing left in the cell were bunk beds and bedding. The blankets were supposedly tear resistant, but could be torn by rubbing them on the edge of a piece of metal such as a square bar or the edge of a bed.

There were monitoring systems in the jail which were functioning. These included an audio system in each cell, and TV monitors in the hallways but not in the cells. The jailers were attentive to their duties and made periodic checks of the cells.

Sometime during the evening Cartwright did make a statement about killing himself, which was overheard by the jailers. That is significant evidence for plaintiffs, and if considered alone might result in a duty on the part of defendants to take further protective steps. However, the circumstances of that statement lead to a different conclusion. Cartwright and Daniello were then in their separate cells. There was loud and boisterous yelling between them, including laughing, shouting, joking, and vulgarity. Daniello faked a suicide, and when the jailers responded to it seriously, she bragged to Cartwright that she had fooled the jailers. Cartwright and Daniello continued with their shouting and jocularity, or what the jailers reasonably believed was jocularity. The jailers thereafter increased the frequency of their cell inspections, and Cartwright was last checked approximately fifteen minutes to a half hour before he was found hanging. Earlier in the evening Cartwright had also talked to the jailers, and his conversations gave them no reason to believe that Cartwright was depressed or suicidal. Daniello was apparently not concerned about Cartwright's statement, because she went to sleep.

In summary, the jailers did not have sufficient reason to believe that Cartwright's statement was serious, or anything other than the continued course of harassment and joking by Cartwright and Daniello. Nor did the jailers have sufficient reason to believe that Cartwright was in such a condition that he should have been taken to a hospital for preventive care.

The court finds, although the evidence is not conclusive, either that Cartwright tried to fake a suicide attempt, as Daniello had done, but lost consciousness because of his intoxicated and drugged state; or that in that state, Cartwright became irrationally despondent over some comments with Daniello made between their cells.

One other fact should be mentioned; that is, Cartwright was not given access to a telephone to make a call. However, the court does not believe that this was legally significant. Cartwright was not sober enough to make a call, and defendants promised Cartwright a call when he sobered. In addition, Cartwright was going to be released when he did sober, with no charges filed against him. The record also demonstrates that the jailers were busy at the time with other duties.

In summary, the court finds that the defendant jailers and police officers acted reasonably in the handling of Cartwright and in the supervision of the jail. In dealing constantly with prisoners who are angry, intoxicated, threatening, or otherwise engaged in less than civilized conduct, police and jailers must have some room for a reasonable interpretation of events and a reasonable reaction to them. The court does not believe that the conduct of the jailers and the police with respect to possibly preventing Cartwright's suicide constituted either negligence or a deliberate indifference to a serious medical need or a known likelihood of harm. Plaintiff's constitutional rights were not violated by defendants' not preventing Cartwright's suicide.

## V.

### *Aid After Discovery of Cartwright*

■ Plaintiffs claim that their constitutional rights were violated because defendants gave Cartwright inadequate medical aid after discovering him hanging in his cell. Specifically, they focus on the five to seven minutes between the time Cartwright was first discovered hanging and the time the ambulance crew arrived to take over his medical aid. Plaintiffs allege primarily that defendants did not give Cartwright cardio pulmonary resuscitation ("CPR") during that five to seven minute interval.

While there are some conflicts in the evidence, the court concludes by a preponderance of the evidence that defendants did all they could under the circumstances to aid Cartwright; that they acted rapidly and reasonably; and that they are not liable to plaintiffs, under either a legal standard of negligence or a legal standard of deliberate indifference to an obvious medical need.

As stated, Cartwright was discovered hanging in his cell by defendant Stottsberry. Stottsberry immediately called for help and tried to lift Cartwright's weight off of the noose. Others responded to Stottsberry's call immediately, including defendants Dowell, Duerks, and Jennings. Dowell immediately began cutting Cartwright down with a pocket knife. Officers Duerks and Jennings called for emergency help to the ambulance and the fire departments. Plaintiffs dispute the adequacy of this call for outside medical help, but the evidence is clear that Jennings made a call over his radio for "Code 3" assistance—the highest level of emergency. The reactions of Duerks and Jennings in calling for help were immediate, and were obviously for the purpose of getting professional help for Cartwright. Plaintiffs argue that the fire department should have been called first, because of its resuscitation capabilities and its possibly faster response time. However, the evidence demonstrated that the procedure in such a medical emergency was for both fire and ambulance to be called; and it was the procedure of the ambulance or fire department, whichever received the first call, to immediately call the other. The ambulance arrived five to seven minutes after Cartwright was first discovered, and the fire department just a few minutes after that. Defendants aided the ambulance and fire crews, both in handling Cartwright and in arranging a phone link between the jail and the supervising hospital.

As stated, plaintiffs focus on whether Cartwright was given CPR before the emergency crews arrived. Officers Duerks and Jennings and jailer Stottsberry were trained in CPR. However, none had ever had occasion to actually use it in an emergency situation. Jailer Dowell did not have CPR training, but he was not required to do so under the standards existing in 1979.

After Dowell succeeded in cutting Cartwright down, defendants laid Cartwright out on the cell floor. They immediately attempted to aid Cartwright. They used the established procedures for checking for his vital signs, which are necessary preliminary procedures in CPR. There was testimony that those procedures could be done in a matter of seconds; but there was also testimony that the time necessary for checking symptoms and vital signs and actually starting CPR can vary with the circumstances—each situation being different. And there was testimony that one of the defendants was beginning CPR chest compressions at the time the emergency crew arrived.

The court finds that defendants' actions during the few intervening minutes between discovering Cartwright—cutting him down, checking his vital signs, and giving him aid—and the arrival of the emergency crews was not deficient. While all persons connected with the event would undoubtedly, as a matter of retrospect, have preferred to move with the greater speed and certainty that hindsight provides, that is not the standard for a violation of constitutional rights or the imposition of civil liability. In summary, defendants reacted immediately to Cartwright's hanging, attempted to aid him, and got emergency medical help

for him rapidly. The actions of defendants were not negligent, and certainly were not deliberate indifference to Cartwright's distress.[5]

The court concludes that none of plaintiffs' constitutional rights were violated by defendants after discovering Cartwright hanging in his cell.

## VI.

### Investigation and Destruction of Records and Evidence

One of plaintiffs' claims is based on an allegedly inadequate investigation of Cartwright's death, and on the later destruction of documents and evidence pertaining to it.

■ There were investigations immediately after Cartwright died. That evening, after learning that Cartwright was dead, the police took photos of the scene and undertook an immediate investigation. Another investigation was conducted by the Sheriff-Coroner, and there was an inquest by the Coroner's jury. In addition, as is routine in certain cases, the district attorney was notified and a representative of his office attended the inquest. Those investigations and the inquest all resulted in the conclusion that Cartwright had committed suicide by hanging, and none made any accusations of improper conduct by any of the persons involved.

Some of the investigation was not as thorough as plaintiffs would like, or as detailed as the court might like in the retrospect of this litigation. However, at the time the investigations were conducted, there was no reason for more thoroughness because all of the evidence pointed to suicide. The investigations were done primarily for the purposes of establishing the cause of death and any criminal fault in connection therewith, and not in contemplation of civil litigation years later.

The court finds that the defendants' investigation was adequate under the circumstances. There was certainly no attempt to cover-up the events.

■ Plaintiffs contend that the allegedly inadequate investigation deprived Reid of effective access to the courts. However, this court does not agree that the investigations had that result, or that Reid was denied access to the courts.

■ Defendants argue that no post-death events could legally interfere with plaintiffs' alleged constitutional rights, under the authority of *Guyton v. Phillips,* 606 F.2d 248, 250 (9th Cir.1979); *Whitehurst v. Wright,* 592 F.2d 834, 840–841 (5th Cir.1979); *McQurter v. City of Atlanta,* 572 F.Supp. 1401, 1419 (N.D.Ga.1983). Those authorities are persuasive that the civil rights of a person cannot be violated after death, and therefore the scope of an investigation after death is not actionable.

■ Plaintiffs' response is that the lack of thoroughness of the investigation was a policy of defendants, which policy existed prior to Cartwright's death, and that the policy resulted in procedures which insulated the city and its personnel from liability for violations of constitutional rights. *See Webster v. City of Houston,* 689 F.2d 1220 (5th Cir.1982), *aff'd in part on rehearing,* 739 F.2d 993 (5th Cir.1984). *See also Gomez v. Whitney,* 757 F.2d 1005 (9th Cir. 1985).

However, plaintiffs' arguments and authorities are not factually applicable here. On the issue of defendants' policies and practices regarding investigations, the court examined records of the defendant city regarding other alleged acts of misconduct by the police and in the jail. Those records showed that the defendant city did investigate and take action on complaints brought by citizens. In certain cases, disciplinary action was taken against police officers and jailers where the investigations

---

5. The court is unable to find from the evidence whether Cartwright was dead at the time he was cut down. Some evidence indicated that he was dead at that time. Plaintiffs have certainly not shown by a preponderance of the evidence that Cartwright was alive. If proof of his then being alive is a necessary element to this cause of action, then the court must find that plaintiffs have failed to show the causal connection necessary for establishing liability on this claim.

disclosed improper conduct. The court finds by a preponderance of the evidence that there was no policy or practice of the City to conduct inadequate investigations, either before or after this event.

There was undeniably some later destruction of original documents and physical evidence involved in this case. However, this occurred under lawfully established programs for the routine destruction of documents and property one to three years after an event. Some of the destructions were contrary to the established procedures, *if* the persons who did the destruction [6] were then aware of plaintiffs' claims and suit. However, the evidence demonstrated that those persons believed that they were acting under established programs, and they were not aware of plaintiffs' claims or suit; some did try to determine whether a claim or suit had been filed.

With respect to the documents, copies were made of all of the original documents which were destroyed. The copies were available at trial, and there were few instances where having copies made any difference to readability. There was also an adequate "paper trail" demonstrating what happened to the physical evidence before and at the time it was destroyed. There was no deliberate destruction of evidence for the purpose of interfering with this action, or for the purpose of covering up the events of Cartwright's death.

Finally, the court finds that had either the investigation been better, or the documents and evidence not been destroyed, the result in this case would be no different. A lot of plaintiffs' complaints about the investigation and the destruction really attempted to continue the implications that Cartwright's death was something other than suicide; but as stated, it was stipulated that the death was suicide. Most of the alleged investigative defects and destruction of evidence did not pertain to the issues in this case; that is, whether defendants should have prevented Cartwright's suicide or should have given him better

---

6. Those persons are not defendants in this case.

medical aid after he was discovered hanging.

## VII.

### *The Defendant City*

Since the court has found that none of the individual defendants violated plaintiffs' constitutional rights, consideration of any separate liability of the City might be moot. However, plaintiffs argue that the defendant City has *independent* obligations to plaintiffs with respect to its policies, practices, and procedures. So a discussion of the City's alleged independent liability is appropriate.

In *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the United States Supreme Court held that "municipal liability could only be imposed for injuries inflicted pursuant to government 'policy or custom.'" Citing that case, the Supreme Court later held that the single act of a city employer who was not a municipal policy-maker was not sufficient to establish a municipal policy or custom. *City of Oklahoma City v. Tuttle,* —— U.S. ——, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). The court noted that the "full contours of municipal immunity under § 1983" had not been addressed by the court. The court also called into question whether there could be a municipal "policy" of "inadequate training" (105 S.Ct. p. 2436), one of the charges made by plaintiffs here. However, regardless of the legal standard as to whether inadequate training may or may not rise to the level of a policy or custom of a city to be an actionable constitutional violation, this court finds in this case that the City's training was adequate.

The City had extensive training programs for its police officers both before being sworn and ongoing, and had both in-house training and programs at educational facilities. Those courses included CPR training. The City also had in-house training programs and continuing edu-

cation for its jailers, although they were not as extensive as those for police officers because the police are sworn law enforcement officers. Outside courses were also available for jailers, but were not required by then contemporary standards.

 The City also had written procedures and policies in operational manuals. A manual of procedures and practices specifically for the jail was in the process of being written, and was in draft form, at the time of the events. The policies and practices were reasonably followed by the individual defendants, and any deviations were inadvertent and reasonable under the circumstances, or involved matters which did not causally affect plaintiffs' claims in this case.

 The jail facilities were reasonably adequate, including humane cells for confinement and systems for monitoring the verbal and visual conduct of the prisoners. Emergency procedures were established and were used when Cartwright was discovered. As stated by the Ninth Circuit in *Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir. 1982), if a prison has constitutionally adequate facilities, policies and training programs, the federal court should not interfere with decisions made by state officials.[7]

 As discussed above, plaintiffs challenge the adequacy of the City's investigation procedures, and its procedures for the preservation of documents and potential evidence. The court reviewed other files of the City regarding alleged cases of misconduct by jailers and police personnel. The court finds that there is no pattern or practice of inadequate investigation. Indeed, the records show that the City takes seriously any complaints which are made by its citizens, conducts investigations, and takes remedial and disciplinary steps when the results so indicate. The City has procedures for the preservation of documents and property, and for their periodic routine destruction in compliance with law. While it is true that here some original documents and some physical property were inadvertently destroyed in a manner not consistent with those procedures, that is not sufficient to impose liability on the City.

There is little doubt that as a matter of retrospect the events in this case will cause the City to improve its procedures for the supervision of prisoners and the control of evidence and records. However, the court finds that the City's procedures in 1979 were adequate and were in compliance with constitutional requirements and contemporary standards.

### VIII.

For the reasons stated above, the court finds and concludes against plaintiffs on paragraphs 17, 18, 20 and each subparagraph thereof, 23, 26, 27, 29 and each subparagraph thereof, 30, 31, and 32 of plaintiffs' Third Amended Complaint.

Because of the above decisions, the court need not and does not consider the issues of damages or the other defenses raised by defendants, including qualified immunity, contributory negligence, superseding cause, and state law immunity.

IT IS ORDERED that judgment be entered in favor of defendants and against plaintiffs.

---

7. The court has reviewed the City's records of another jail death which occurred two years after Cartwright's. Plaintiffs point to the facts of that death occurring, and that CPR was not administered to the victim when discovered, as evidence of the City's policies and practices. However, having reviewed the file of that incident, the court finds that there were obvious signs of death when the decedent was discovered and hence no reason for CPR. The other circumstances involving that death were not sufficiently probative or parallel to establish any relevant policy or practice. That event did not involve any of the individual defendants here, and the two year time lapse alone makes any relevance questionable.