OPINION
{¶ 1} Plaintiff-appellant, Robert Hiles, individually and as the administrator of the estate of Michael Hiles, appeals from a judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendants-appellees, the Franklin County Board of Commissioners, Franklin County Sheriff Jim Karnes, Corporal John Myers, Sergent Paul Theodore, and Deputies Timothy Mace, Paula Andy, Brian Sibbalds, and Roderick Thorne. For the following reasons, we affirm that judgment.
 {¶ 2} Michael Hiles was appellant's adopted son. In April 1998, Michael robbed a gas station in Grove City, Ohio. At the time of the robbery, Michael was 20 years old. Subsequently, Michael was arrested and charged with robbery and other offenses. Pursuant to a plea agreement, he pled guilty to charges in exchange for a two-month prison term at Orient Correctional Institute followed by a six-month involuntary commitment to a rehabilitation center. Michael had a significant history of drug and alcohol abuse as a teenager.
 {¶ 3} Michael remained out of jail on bond awaiting his scheduled sentencing hearing. During this period of time, Michael abused drugs and alcohol to such an extent that appellant became concerned that Michael could harm himself and others. Appellant also worried that Michael might do something that would jeopardize his plea agreement. Because of this concern, appellant contacted Michael's attorney and arranged to have Michael's bond revoked so that Michael would be taken into custody before he was sentenced. On August 14, 1998, the trial court revoked Michael's bond and placed him in the custody of the Franklin County Corrections Center ("jail").
 {¶ 4} During the jail's admission process, a nurse asked Michael a number of questions as part of an initial medical screening. One of the questions was whether he had ever considered or attempted suicide. Michael apparently responded affirmatively because the nurse wrote down "6 months" in response to that question on the medical screening form. Because of Michael's affirmative response to this question on the medical screening form, Michael was asked additional questions from a "Mental Health Questionnaire." In response to a question about whether Michael had ever tried to commit suicide and, if so, how many times, the nurse wrote down "6 months ago." In a separate comment section to that question, the nurse also wrote that Michael "denies suicidal ideations at this time." Michael was incarcerated, but was not put on any type of suicide watch.
 {¶ 5} According to appellant, Michael had attempted suicide two or three times between 1995 and 1998, although appellant doubted the sincerity of these attempts and felt they were efforts to avoid discipline. Appellant had no indication that Michael might be suicidal at the time of his incarceration. Nor did Michael give appellant any reason to suspect that his incarceration had caused him to consider suicide. Therefore, appellant did not have any conversations with jail authorities about placing Michael on a suicide watch.
 {¶ 6} In the early morning hours of September 11, 1998, Michael was in a cell on the third floor of the jail. Michael's cell was less than a minute's walk from the guard's office. Deputy Mace was assigned to supervise the third floor of the jail that morning. Guards in the jail must perform hourly rounds of the floor they are supervising. During their rounds, guards activate watch tour buttons at certain locations on each floor. The activation of the tour button informs the jail's command center (located on the first floor of the jail) that the guards are doing their required rounds. A computer system records and logs in real time almost every function that occurs in the jail, including the activation of these tour buttons and the opening and closing of cell doors. According to those records, Deputy Mace began a tour of the third floor of the jail at 2:26:37 a.m. and finished the tour at 2:30:30.
 {¶ 7} Between 2:45 a.m. and 3:15 a.m., Deputy Mace had to quiet down some of the inmates on the third floor who were yelling at each other. Michael was involved in the disturbance. Deputy Mace then returned to his guard station. Wayne McClaskey, an inmate in a cell near Michael, testified that the inmates were harassing Michael by making sexual threats against his wife and by telling him that they would kill themselves if they had been turned in by their father. McClaskey thought that the harassment upset Michael because he heard Michael banging the walls and cell door, which apparently caused the door to vibrate. The jail's computer records indicate there were disturbances with Michael's cell door at 3:04:36 a.m. and 3:07:49 a.m. McClaskey then heard a gurgling sound that he assumed, considering all that had gone on before, was Michael trying to kill himself.
 {¶ 8} According to the jail's computer records, Deputy Mace began his next round of the third floor at 3:27:55 a.m. He activated the east entrance tour button at 3:28:09 a.m. and the third floor medical tour button at 3:28:26 a.m. Continuing west on the floor, he arrived at the north portion of the wing at 3:30:25 a.m. Shortly thereafter, Deputy Mace arrived at Michael's cell. He saw Michael standing straight up, with his back to the cell door. Michael's knees did not appear to be bent, although his neck was slightly at an angle. Deputy Mace then noticed a sheet around Michael's neck that was tied to the top of the cell door. At this point, Deputy Mace did not know whether Michael was faking suicide in an attempt to get Deputy Mace to open the cell door, or whether the suicide was real. Deputy Mace yelled out Michael's name a couple of times, but Michael did not respond. Deputy Mace climbed up the outside of the cell door and untied the sheet from the cell door. Michael slumped forward onto the floor of his cell.
 {¶ 9} Deputy Mace then contacted the command center and asked them to open Michael's cell door. Deputy Mace still did not know for sure whether this was a hoax or a true medical emergency. Therefore, he did not immediately tell the command center that he had a medical emergency and he did not call a "Code Blue Medical." A Code Blue Medical orders the jail's Emergency Response Team ("ERT") and medical staff to respond to the location. That morning, the ERT consisted of Deputies Thorne, Sibbalds, and Andy, as well as Corporal Myers and Sergeant Theodor.
 {¶ 10} According to the computer records, Michael's cell door opened at 3:33:07 a.m. Deputy Mace, calling Michael's name, went into the cell and untied the sheet from around Michael's neck. He picked up Michael's arm and shook him to try to wake him. Getting no response, Deputy Mace called the command center for a Code Blue Medical. He did not call for an emergency squad. At 3:34:41 a.m., the command center initiated the jail's page system to communicate the Code Blue Medical to the entire facility. Before the ERT arrived, Deputy Mace tried to ascertain whether or not Michael had a pulse but he did not attempt to perform rescue breathing. The ERT arrived at 3:36:31 a.m. just as Deputy Mace was pulling Michael out of his cell.[1] Deputy Mace told Corporal Myers that he was not sure if Michael had a pulse. Corporal Myers took out a protective device to perform CPR when medical personnel arrived at the scene.
 {¶ 11} Nurses Pearley Gable and Pam Martin arrived at the scene at 3:37:13 a.m., less than a minute after the ERT arrived. Nurse Gable took charge of the scene and tried to determine if Michael had a pulse. He told the guards at the scene that he thought there was a faint pulse. He requested an emergency squad and began CPR at 3:40:02 a.m. Sometime between 3:43 and 3:44 a.m., before the emergency squad arrived, Nurse Gable stopped administering CPR to Michael and left the scene to call his commanding doctor. Nurse Gable admitted that he should not have stopped CPR before the emergency squad arrived. Michael received no further medical attention after Nurse Gable left the scene until the emergency squad arrived. The Columbus Fire Department's emergency squad arrived at Michael's cell between 3:50 and 3:51 a.m. and initiated CPR again. The emergency squad could not resuscitate Michael and he was pronounced dead later that morning.
 {¶ 12} As a result of Michael's death, appellant filed a complaint in the Franklin County Court of Common Pleas against appellees.[2] The complaint set forth wrongful death and survivorship claims, as well as a claim for assault and battery ("state law claims"). The complaint also asserted a federal claim under Section 1983, Title 42, U.S. Code ("1983 claim"), alleging that the appellees violated Michael's constitutional rights. Appellees moved for summary judgment on all of appellant's claims. Appellant responded by claiming that issues of fact existed that made summary judgment inappropriate. The trial court disagreed and granted appellees' motion for summary judgment in its entirety.
 {¶ 13} Appellant appeals, assigning the following errors:
1. The trial court erred in granting summary judgment dismissing Plaintiff's claim under 42 U.S.C. § 1983 when the record contained probative evidence establishing a violation of the decedent's constitutional rights.
2. The trial court erred in granting summary judgment dismissing Plaintiff's state law claims and in finding that the Defendants were immune from liability pursuant to Chapter 2744 of the Ohio Revised Code.
 {¶ 14} Appellant's appeal is from the trial court's grant of summary judgment to appellees. Appellate review of summary judgment motions is de novo. Helton v. Scioto Cty. Bd. ofCommrs. (1997), 123 Ohio App.3d 158, 162. "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." Mergenthal v. Star Banc Corp.
(1997), 122 Ohio App.3d 100, 103. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. State ex rel. Grady v. State Emp.Relations Bd. (1997), 78 Ohio St.3d 181, 183.
 {¶ 15} In his first assignment of error, appellant contends the trial court erred when it granted summary judgment in favor of appellees on his 1983 claim. Section 1983, Title 42, U.S. Code, provides as follows:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress * * *.
 {¶ 16} Section 1983 provides a remedy for violations of substantive rights created by the United States Constitution and federal statutes. Roe v. Franklin Cty. (1996),109 Ohio App.3d 772, 778. In order to prevail on a Section 1983 claim, a plaintiff must establish: (1) that the conduct in controversy was committed by a person acting under color of state law, and (2) that the conduct deprived the plaintiff of a federal constitutional or statutory right. Parratt v. Taylor (1981),451 U.S. 527, 535, 101 S.Ct. 1908, overruled in part on other grounds in Daniels v. Williams (1986), 474 U.S. 327, 330-331,106 S.Ct. 662; 1946 St. Clair Corp. v. Cleveland (1990),49 Ohio St.3d 33, 34.
 {¶ 17} A section 1983 claim can be brought against a public employee in his or her individual capacity and/or in his or her official capacity. Appellant's complaint does not expressly indicate whether the individually named appellees were sued in their individual or official capacities. This is an important distinction in Section 1983 claims. Peoples Rights Org., Inc. v.Montgomery (2001), 142 Ohio App.3d 443, 484; Norwell v.Cincinnati (1999), 133 Ohio App.3d 790, 803. Individual capacity lawsuits seek to impose personal liability on a government official for actions he or she takes under color of state law. Id. Official capacity lawsuits, on the other hand, are not claims against the official personally. Rather, they are just another way of pleading an action against the entity of which the officer is an agent. Id.
 {¶ 18} Where a complaint does not clearly state whether a defendant is being sued in their individual or official capacity, federal courts in this circuit look to the course of proceedings to determine whether the defendant received notice of plaintiff's intent to hold him or her personally liable. Moore v. City ofHarriman (C.A.6, 2001), 272 F.3d 769, 772-773. Analyzing the course of proceedings in this case, we conclude that the individually-named appellees did not receive notice that they were being sued in their individual capacities. The complaint lists the individually-named appellees by their job title (i.e., Sheriff, Deputy, and Corporal) and gives the Franklin County Sheriff's Office as their address. Appellants identify the individual appellees solely as employees or agents of Franklin County and allege that these appellees were acting within the course and scope of their employment with Franklin County, thereby making Franklin County vicariously liable for their conduct under the doctrine of respondeat superior. This is a clear indication that the individually named appellees were sued solely in their official capacities. See U.S. ex rel. Diop v.Wayne Cty. Community College Dist. (E.D.Mich. 2003),242 F.Supp.2d 497, 517-518.
 {¶ 19} In addition, appellees stated in their motion for summary judgment that it was their understanding that the individual defendants were sued solely in their official capacities. Appellant did not contest this understanding in his memorandum in opposition to appellees' summary judgment motion. From the course of these proceedings, it is clear that the individually-named appellees were not on notice that appellant intended to hold them personally liable. Rather, the individually-named appellees were only on notice that they were sued in their official capacity. Therefore, we affirm the trial court's grant of summary judgment in favor of the individually-named appellees in their individual capacities on appellant's 1983 claim.
 {¶ 20} Section 1983 claims against public employees in their official capacity are the equivalent to claims against the governmental entity for whom they work or, in this case, Franklin County. See Stemler v. Florence (C.A.6, 1997), 126 F.3d 856,864, fn. 8 (claim against Boone County sheriff in official capacity treated as claim against Boone County); Brown v.Karnes (S.D.Ohio, Sept. 13, 2005), No. 2:05-CV-555 (suit against Franklin County sheriff in official capacity is suit against Franklin County); Orr v. Trumbull Cty. (N.D.Ohio 1999),77 F. Supp.2d 853, 856 (claim against county sheriff in official capacity is same as against county); Thornhill v. Breazeale
(S.D.Miss. 2000), 88 F.Supp.2d 647, 653 (suit against county sheriff and deputies in official capacity is, in essence, a suit against the county); Gonser v. Twiggs Cty. (M.D.Ga. 2002),182 F.Supp.2d 1253, 1256-1257 (claims against county commissioners duplicative of claims against county itself); cf. Picciuto v.Lucas Cty. Bd. of Commrs. (1990), 69 Ohio App.3d 789, 796 (suit against county properly brought by naming county commissioners). Therefore, the 1983 claims against the individually named appellees in their official capacities are, in essence, claims against Franklin County, not the individuals. Norwell, supra, at 803. Thus, we must determine whether Franklin County is entitled to summary judgment on appellant's claims.
 {¶ 21} A governmental entity such as Franklin County may not be held liable under Section 1983 for the acts of its employees solely based on a respondeat superior or vicarious liability theory. Monell v. Dept. of Social Servs. (1978), 436 U.S. 658,691, 98 S.Ct 2018; Miskovich v. Indep. School Dist. 318
(D.Minn. 2002), 226 F.Supp.2d 990, 1011-1012; Clark v. Dublin
(Mar. 28, 2002), Franklin App. No. 01AP-458. Rather, a governmental entity is liable only if the execution of its policy or custom resulted in the deprivation of a constitutional right.Monell, supra; Barrett v. Wallace (S.D.Ohio 2000),107 F.Supp.2d 949, 955. Therefore, appellant can establish a Section 1983 claim against Franklin County only if it can prove that Franklin County implemented a policy or custom that deprived appellant's decedent of a constitutional right.
 {¶ 22} Appellant claims that Franklin County deprived Michael of his Eighth Amendment right to be free from cruel and unusual punishment when it failed to ensure his safety and to provide necessary medical treatment that may have prevented his death.[3] Under the Eighth Amendment, prisoners have a constitutional right to medical care. Farmer v. Brennan (1994),511 U.S. 825, 832, 114 S.Ct. 1970; Comstock v. McCrary (C.A.6, 2001), 273 F.3d 693, 702. An inmate's Eighth Amendment right is violated when prison officials are deliberately indifferent to the inmate's serious medical needs. Estelle v. Gamble (1976),429 U.S. 97, 104, 97 S.Ct. 285. Deliberate indifference describes a state of mind more blameworthy than negligence, akin to the criminal law concept of recklessness. Farmer, supra, at 835-837. To establish deliberate indifference, appellant must show that the prison official knew of and disregarded an excessive risk to the inmate's health or safety. Id. at 837. This test is both objective and subjective. Objectively, appellant must allege that the deprivation is sufficiently serious. Subjectively, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id.
 {¶ 23} We first address appellant's contention that Franklin County failed to take steps to ensure Michael's safety after learning that Michael had attempted suicide in the past. Psychological needs manifesting themselves in suicidal intentions are serious medical needs. Bradley v. Ferndale (C.A.6, 2005), 148 Fed.Appx. 499, 506. Inmates have an Eighth Amendment right to protection from self-inflicted injuries, including suicide.Belcher v. Foley (C.A.11, 1994), 30 F.3d 1390, 1396. Appellant claims that Franklin County was deliberately indifferent to Michael's suicidal intentions. The danger of suicide clearly satisfies the objective component of deliberate indifference, i.e., the alleged deprivation was sufficiently serious.Comstock, supra; Sanville v. McCaughtry (C.A.7, 2001),266 F.3d 724, 732 (risk of suicide is a serious harm).
 {¶ 24} The subjective component of deliberate indifference requires appellant to demonstrate that prison officials knew that Michael was likely to attempt suicide and they were reckless in failing to eliminate that risk. Appellant points out that Michael told a nurse who initially questioned him that he had previously attempted suicide. Based upon that information alone, appellant argues that appellees were deliberately indifferent to this risk of harm. We disagree.
 {¶ 25} Although Michael initially indicated that he had suicidal thoughts in the past, the record reflects that upon further questioning he denied any current suicidal thoughts. Nor did Michael or appellant give any indication to jail officials that Michael was suicidal prior to Michael's death. Appellant simply failed to present sufficient evidence to create an issue of fact regarding whether appellees knew there was a substantial risk that Michael would attempt suicide and that appellees recklessly disregarded that substantial risk. Accordingly, appellees were not deliberately indifferent to Michael's constitutional right to be protected from self-inflicted injuries. Hott v. Hennepin Cty. (C.A.8, 2001), 260 F.3d 901,906 (officials not deliberately indifferent where evidence indicated officials had no knowledge of inmate's suicidal risk);Greffey v. Ala. Dept. of Corr. (N.D.Ala. 1998),996 F.Supp. 1368, 1383 (officials could not be deliberately indifferent when they lacked knowledge of inmate's previous suicide attempt);Harvey v. Cty. of Ward (D.N.D. 2005), 352 F.Supp.2d. 1003, 1011 (no deliberate indifference when officials did not know of inmate's suicide risk). Without a showing of deliberate indifference, appellant fails to demonstrate that Michael's constitutional right to be protected from suicide was violated. Absent an underlying constitutional deprivation, Franklin County cannot be liable under Section 1983. Napier v. Madison Cty.
(C.A.6, 2001), 238 F.3d 739, 743. In addition, appellant failed to point to a policy of Franklin County that could have caused the alleged deprivation of Michael's constitutional right. A county can only be liable in the 1983 context when a constitutional deprivation is caused by the execution of the county's policy or custom. Monell, supra.
 {¶ 26} Next, appellant contends that Deputy Mace and the ERT violated Michael's constitutional rights by failing to provide him with adequate medical care after finding him hanging in his cell. Section 1983 claims based on a prison suicide are treated as claims based on the failure of prison officials to provide medical care. Barrie v. Grand Cty. (C.A.10, 1997),119 F.3d 862, 866. A failure to provide medical care violates the constitution only if the deputies were deliberately indifferent to Michael's medical needs. Id., citing Estelle; Anton v.Sheriff of Dupage Cty. (N.D.Ill. 1999), 47 F.Supp.2d 993, 1001. In the context of a suicide, we find that the alleged failure to provide adequate medical care is a serious deprivation that satisfies the objective component of the deliberate indifference test. That leaves the question of whether any reasonable jury could find that appellant satisfied the subjective component of the deliberate indifference test. We answer that question in the negative.
 {¶ 27} Deputy Mace was the first prison official to find Michael. He arrived at Michael's cell sometime after 3:30:25 a.m., but before 3:33:07 a.m., when he called to have Michael's cell door opened. Deputy Mace testified that he was cautious when he first saw Michael hanging from the cell door because he did not know whether this was an actual medical emergency or a trick to get him to open the cell door. Therefore, Deputy Mace did not immediately call to have the cell door opened. Instead, he yelled Michael's name a couple of times. Receiving no response, he immediately climbed on the cell door and untied the sheet from the top of the cell door. Michael slumped forward onto the floor of his cell. Deputy Mace then called the command center and requested that they open Michael's cell door. After he entered the cell and tried to determine if Michael had a pulse, Deputy Mace knew this was not a hoax and called a Code Blue Medical emergency at 3:34:41. Deputy Mace did not attempt to administer CPR. He pulled Michael out of the cell so that the medical personnel, who were on their way, could easily reach him. The ERT arrived on the scene at 3:36:31 a.m., and the nurses arrived shortly thereafter — 3:37:13 a.m. At most, six and one-half minutes passed from when Deputy Mace first saw Michael hanging from his cell door to when the ERT arrived.
 {¶ 28} These undisputed facts establish that Deputy Mace was not deliberately indifferent to Michael's medical needs. Deputy Mace did not immediately enter Michael's cell because of a valid safety concern. Instead, he called out Michael's name, immediately untied the sheet from the cell door, and then requested the command center to open the cell door. Once he entered the cell, he quickly ascertained that this was not a hoax and called a Code Blue Medical for medical personnel to respond immediately. He also attempted to find Michael's pulse.[4]
The ERT arrived just as Deputy Mace was pulling Michael out of the cell. This is not deliberate indifference to Michael's serious medical needs.
 {¶ 29} Appellant faults Deputy Mace for his failure to perform CPR on Michael. However, a number of federal courts have ruled that prison guards do not act with deliberate indifference when they fail to perform CPR on a prisoner found hanging in a cell. See Martin v. Somerset Cty. (D.Me. 2005),387 F.Supp.2d 65, 80 (no deliberate indifference where prison guards who found hanging inmate did not perform CPR); Estate of Cartwright v.Concord (N.D.Cal. 1985), 618 F.Supp. 722, 729-730 (finding prison guards not deliberately indifferent to suicide victim when they reacted immediately, attempted aid, and got emergency help to him, although they did not perform CPR); Clinton v. York
(D.S.C. 1995), 893 F.Supp. 581, 586-587 (failure to provide CPR was, at most, negligence); Bahner v. Carmack (C.A.8, 1997), 107 F.3d 875 (failure of deputy who found hanging prisoner to, among other things, perform CPR was not deliberate indifference).
 {¶ 30} Nor did the ERT members act with deliberate indifference. The ERT members arrived at Michael's cell at 3:36:31 a.m., about 50 seconds before medical personnel arrived, and assumed responsibility for Michael's medical care. One member of the ERT, Corporal Myers, immediately asked Deputy Mace if Michael had a pulse. Corporal Myers then took out a protective device from his belt to begin CPR. He stopped when the nurses arrived less than 50 seconds later and took charge of the scene. Nurse Gable requested an emergency squad and administered CPR. Such action by the ERT members in such a short time span did not demonstrate deliberate indifference.
 {¶ 31} Nor were the ERT members deliberately indifferent by not resuming CPR after Nurse Gable stopped CPR and left the scene. Nurse Gable did not ask for any medical assistance from the ERT members or give any instructions. The emergency squad was on its way. Moreover, as previously noted, failure to administer CPR, by itself, does not establish deliberate indifference.Martin, supra; Estate of Cartwright, supra.
 {¶ 32} Because reasonable minds could only conclude that appellees did not act with deliberate indifference to Michael's serious medical needs, Michael was not deprived of his constitutional rights. Absent an underlying constitutional deprivation, Franklin County cannot be liable under Section 1983.Napier, supra. Therefore, the trial court properly granted summary judgment in Franklin County's favor on appellant's 1983 claim. Appellant's first assignment of error is overruled.
 {¶ 33} Appellant's second assignment of error addresses the trial court's grant of summary judgment in favor of appellees on appellant's state law claims. The trial court determined that appellees were immune from liability for the state law claims as a matter of law pursuant to R.C. Chapter 2744. We agree.
 {¶ 34} We first address appellant's state law claims against Franklin County. Franklin County is a political subdivision. R.C.2744.01(F); Duff v. Coshocton Cty., Coshocton App. No. 03-CA-019, 2004-Ohio-3713, at ¶ 23. R.C. Chapter 2744 sets forth a three-tiered analysis for determining whether a political subdivision is immune from liability in a civil action. Estateof Ridley v. Hamilton Cty. Bd. of Mental Retardation Developmental Disabilities, 150 Ohio App.3d 383, 2002-Ohio-6344, at ¶ 26. Initially, pursuant to R.C. 2744.02(A)(1), Franklin County is immune from liability in a civil action for injury, death, or loss to persons allegedly caused by an act or omission of Franklin County or its employees in connection with a governmental or proprietary function. The operation of the Franklin County jail is a governmental function. R.C.2744.01(C)(2)(h); Buoscio v. McFaul (Aug. 2, 2001), Cuyahoga App. No. 78758. Therefore, unless an exception applies, Franklin County is immune from appellant's state law claims.
 {¶ 35} The general grant of immunity found in R.C.2744.02(A)(1) is subject to the exceptions contained in R.C.2744.02(B). However, appellant does not argue that any of those exceptions apply. Rather, appellant contends that R.C.2744.03(A)(6) negates that immunity. We disagree. R.C. 2744.03
provides defenses and immunities to liability in civil actions. It does not create a basis for liability. Ridley, at ¶ 28;Jones v. Franklin Cty. Sheriff's Dept. (June 21, 1999), Butler App. No. CA99-01-004. Additionally, R.C. 2744.03(A)(6) applies only to individual employees and not to political subdivisions.Fabrey v. McDonald Village Police Dept. (1994),70 Ohio St.3d 351, 356. Therefore, this provision has no relevance to Franklin County. Id.
 {¶ 36} Because none of the exceptions in R.C. 2744.02(B) apply in this case, Franklin County is immune from appellant's state law claims. Id.; Wynn v. Butler Cty. Sheriff's Dept.
(Mar. 22, 1999), Butler App. No. CA98-08-175 (finding political subdivision immune from suit where none of the exceptions apply). Therefore, the trial court properly granted summary judgment to Franklin County on appellant's state law claims.
 {¶ 37} As discussed above, appellant's claims against the individual appellees were filed against them in their official capacities. These are the equivalent of claims brought against Franklin County. Consequently, the immunity of Franklin County extends to the individual appellees and they are entitled to summary judgment on appellant's state law claims as well. Woodsv. Wellston (S.D.Ohio, June 15, 2005), NO. 2:02CV762; Smitek v.Peaco (Jan. 27, 1993), Lorain App. No. 92CA005359.
 {¶ 38} Even if we were to address appellant's state law claims against the individual appellees, they still fail. Deputy Mace and the ERT members are all employees of Franklin County and/or the Franklin County Sheriff's Office. Both entities are political subdivisions. R.C. 2744.01(F); Buoscio, supra. Employees of a political subdivision are immune from suit unless one of the exceptions found in R.C. 2744.03(A)(6) or (7)5 strip them of that immunity. Franklin v. Dayton Probation Servs.Dept. (1996), 109 Ohio App.3d 613, 616; Workman v. FranklinCty. (Aug. 28, 2001), Franklin App. No. 00AP1-449. Appellant contends that the employees should be stripped of their immunity in this case because they acted "with malicious purpose, in bad faith, or in a wanton or reckless manner." R.C. 2744.03(A)(6)(b). Specifically, appellant argues that a question of fact exists regarding whether or not the individually-named defendants acted in a wanton manner. We disagree.
 {¶ 39} The standard for showing wanton conduct is extremely high. Fabrey, supra. Wanton conduct is a degree greater than negligence. Baber v. Dennis (1979), 66 Ohio App.2d 1. Wanton conduct has been characterized as the failure to exercise any care whatsoever. Wooten, supra, at ¶ 19, citing Fabrey,
supra; Peoples v. Willoughby (1990), 70 Ohio App.3d 848, 851
("entire absence of all care for the safety of others and an indifference to consequences"). Wanton conduct connotes behavior demonstrating a deliberate or reckless disregard for the safety of others. Carter v. Columbus (Aug. 15, 1996), Franklin App. No. 96APE01-103; see, also, State v. Earlenbaugh (1985),18 Ohio St.3d 19, 21-22 ("A wanton act is an act done in reckless disregard of the rights of others which evinces a reckless indifference of the consequences to the life, limb, health, reputation, or property of others.").
 {¶ 40} Determining whether a defendant engaged in wanton conduct is generally a question of fact for the jury. Fabrey,
supra. However, where the record contains insufficient evidence to support such a finding, a trial court correctly grants summary judgment for the defendant. See Wooten v. Vogele,147 Ohio App.3d 216, 2001-Ohio-7096, at ¶ 18; Rose v. Haubner (June 5, 1997), Franklin App. No. 96APE11-1488 (affirming summary judgment where officer's conduct did not demonstrate deliberate or reckless disregard for safety of others).
 {¶ 41} Here, appellant failed to present evidence sufficient to create an issue of material fact as to whether or not Deputy Mace and the ERT members acted in a wanton manner. The undisputed evidence demonstrates they did not. See Vince v. Canton (Apr. 13, 1998), Stark App. No. 1997CA00299 (conduct could not be construed as wanton). Deputy Mace was cautious when he saw Michael hanging from the cell door because he was not sure if Michael was really attempting suicide. He called out Michael's name, then untied him from the cell door. Seeing Michael's body fall to the floor, he ordered the door opened. He went inside, checked Michael's status, and then called a Code Blue Medical. This action took less than four minutes. After he called the Code Blue Medical, Deputy Mace tried to determine if Michael had a pulse. He then began to pull Michael outside the cell when the ERT arrived. Corporal Myers asked Deputy Mace if Michael had a pulse and then prepared to begin CPR. Less than a minute later, the nurses arrived and assumed responsibility for administering medical care.
 {¶ 42} This undisputed evidence falls far short of wanton conduct. Deputy Mace's failure to immediately perform CPR, while possibly negligent, does not rise to the level of wanton conduct. See Wooten, supra, at ¶ 20 (genuine issues of material fact may have been created on negligence, but not for heightened level of wanton or reckless conduct). Corporal Myers and the other ERT members had less than a minute with Michael before medical personnel arrived and assumed responsibility for his care. During that short time frame, Corporal Myers prepared to administer CPR. No reasonable jury could find that this conduct was wanton or reckless. Cutts v. Canton (July 6, 1998), Stark App. No. 1997CA00405 (reasonable minds could only conclude that officer's conduct was not wanton); Bowlander v. Ballard, Sandusky App. No. S-02-029, 2003-Ohio-2907, at ¶ 26 (summary judgment properly granted where evidence did not demonstrate wanton conduct). Likewise, given the absence of instructions from medical personnel on the scene, the ERT members' failure to administer CPR after the nurses left the scene, but before the emergency squad arrived, while possibly negligent, does not rise to the level of wanton conduct. Wooten, supra, at ¶ 20.
 {¶ 43} In the absence of evidence that the individual appellees acted "with malicious purpose, in bad faith, or in a wanton or reckless manner," the trial court properly granted summary judgment in their favor on appellant's state law claims. Therefore, appellant's second assignment of error is overruled.
 {¶ 44} Having overruled appellant's two assignments of error, the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
Brown, P.J., and McGrath, J., concur.
[1] One duty of the ERT is to videotape any scene to which it is called. Here, the videotape contains a running time of events that is not identical to the times recorded in the jail's computer system. The parties attempted to correlate the two times but they appeared to differ by 8 to 10 seconds. Therefore, for some events occurring after the ERT arrived, the recorded times could be off by 8 to 10 seconds.
[2] Appellant's complaint also named as defendants: (1) EMSA Correctional Care, Inc., an entity that contracted with Franklin County to provide medical services at the jail; (2) Nurses Gable and Martin, both EMSA employees; and, (3) Southeast, Inc., an entity that contracted with Franklin County to provide mental health or psychological evaluations for inmates at the jail. Appellant eventually resolved him claims against these parties.
[3] We note that Michael had not yet been sentenced at the time of his death. Although Eighth Amendment prohibitions do not apply to pretrial detainees, the Fourteenth Amendment's due process clause provides the same protections to detainees as theEighth Amendment does to convicted persons. MIller v. Calhoun Cty.
(C.A.6, 2005), 408 F.3d 803, 812.
[4] These facts distinguish this case from Heflin v. StewartCty. (C.A.6, 1992), 958 F.2d 709, in which the court affirmed a jury verdict for an inmate who was found hanging by prison officials. The court noted that the officials in that case left the inmate hanging for at least 20 minutes without trying to assist him. Additionally, the Heflin case was decided before the United States Supreme Court defined deliberate indifference to include both subjective and objective components. Farmer,
supra.